IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2011

## CHARLES LAMB v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 230300      Rebecca J. Stern, Judge**

---

**No. E2010-00377-CCA-R3-PC - Filed February 23, 2011**

---

Aggrieved of his convictions of first degree murder and conspiracy to commit first degree murder, the petitioner, Charles Lamb, filed a timely petition for post-conviction relief alleging that he had been deprived of the effective assistance of counsel. In this appeal, he challenges the denial of his bid for post-conviction relief. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Donna Miller (on appeal); and Samuel F. Robinson III (at hearing), Chattanooga, Tennessee, for the appellant, Charles Lamb.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William H. Cox III, District Attorney General; and William Hall, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In January 1996, a Hamilton County Criminal Court jury convicted the petitioner of first degree premeditated murder and conspiracy to commit first degree murder for his role in the shooting death of the victim, James "Bubba" Cook. On direct appeal, this court affirmed the convictions and accompanying effective sentence of life plus 20 years' imprisonment. *See State v. Charles Edwin Lamb*, No. 03C01-9701-CR-00010 (Tenn. Crim. App., Knoxville, Feb. 20, 1998), *perm. app. denied* (Tenn. Nov. 2, 1998).

The factual summary by this court on direct appeal shows that the petitioner, his co-defendant and nephew Chris Beard, and the victim were members of a criminal organization called the "Regulators" whose members committed crimes including "auto thefts, shopliftings, burglaries, assaults, drug violations, the fencing of stolen goods, and murder." *See id.*, slip op. at 3. In November 1994, the petitioner discovered that Mr. Beard and two other members of the organization, to fund their personal drug habits, had surreptitiously sold cigarettes originally stolen by the gang and that some of the crack cocaine purchased by the group had come from the victim. *See id.*, slip op. at 4. On November 11, the petitioner asked fellow Regulators Namon Davis and Clyde White to assist in the victim's murder. On the following morning, Mr. Beard and the victim went to the petitioner's house after the petitioner demanded to speak with Mr. Beard. *See id.*, slip op. at 5. At that point, Mr. Beard confessed the scheme.

Following Mr. Beard's admission, the petitioner suddenly struck the victim with "a 'police issue billy club'" and continued to beat the victim until the victim "begged to die." *See id.* At that point, the petitioner agreed to permit the victim to commit suicide, ordered the victim to write a suicide note, and allowed the victim to smoke a cigarette. *See id.*, slip op. at 6. The petitioner then ordered Mr. Beard to "'take care of his drug problem,'" and Mr. Beard shot the victim just above the left eye. *Id.* As the victim lay dying, the petitioner struck him forcefully in the back of the neck, saying, "'That ought to kill him.'" *Id.* The petitioner then ordered Mr. Beard and Mr. Davis to find shovels so that the victim's body could be buried. *See id.* After taking a break for lunch, the men discovered that the victim was still breathing, so the petitioner ordered Mr. Davis to place a pillow over the victim's face and stand on the victim's head until the victim died. *See id.*

On the petitioner's orders, the men wrapped the victim's body first in plastic, then in duct tape, and finally in carpet before placing the body into the back of the petitioner's van. *See id.*, slip op. at 7. They then cleaned the garage area. The men then drove to the county "dump" in Sequatchie County, where they buried the victim's body under a pile of rocks and burned his personal items in a dumpster. *See id.* The police first learned of the victim's murder while interrogating Mr. Beard about a burglary. *See id.*

At the post-conviction evidentiary hearing, the petitioner's mother, Gladys Lamb, testified that on November 12, 1995, the petitioner arrived at her house at 9:00 a.m. for a family celebration and that he did not leave until after midnight. She said that she informed the petitioner's trial counsel of the event but that trial counsel never asked her to testify at the petitioner's trial. She claimed that Hamilton County detectives told her "not to get involved" and prevented her from entering the court room during the petitioner's trial.

The petitioner's cousin, Mary Elizabeth Nelson, corroborated Ms. Lamb's

testimony that the petitioner was at Ms. Lamb's house for a family celebration from mid-morning until after midnight on November 12, 1995. She stated that she never gave trial counsel this information. During cross-examination, Ms. Nelson said that she never provided the petitioner's alibi information to anyone because she "didn't know who to get in touch with."

The petitioner's "foster sister," Karen Moss, also testified that the petitioner arrived for a family celebration during the mid-morning hours of November 12, 1995, and that he did not leave until after midnight. During cross-examination, Ms. Moss said that she never informed anyone of this alibi information because she "didn't know what to do."

The petitioner testified that he went to his mother's house on the day of the victim's murder at approximately 9:00 a.m. and that he stayed at her house for the duration of the party well into the late evening hours. He said that while he was at the party, he showed his mother "a suicide note that Bubba had supposedly wrote and left in a picture frame." He said that, on his mother's suggestion, he gave the note to the victim's mother on the following day. The petitioner could not recall if he had told trial counsel that he was at his mother's house on the day of the victim's murder. He claimed that Mr. Beard murdered the victim and that he did not even know the victim was dead until he was arrested.

The petitioner claimed that although trial counsel called him as a witness so that he could "explain to them that [he] wasn't there and had witnesses," the trial court interrupted his testimony for a recess and that counsel "never put [him] back on the stand." He contended that his only testimony was that the victim "was a little unusual."

The petitioner recalled having a mental evaluation prior to his trial and claimed that, while he was in jail awaiting trial, he "was subliminaled . . . . You know, that's saying the same thing over and over a few thousand times under a real low frequency." He said that his "Uncle Alton," a former Marine, had stolen "a set of that equipment" to create subliminal messages. He claimed, as he had at trial, that both Walmart and K-Mart "use a subliminal machine on their customers." The petitioner stated that he was more vulnerable to subliminal messages because he "got blew [sic] up by a truck tire" and that, as a result, he can "hear frequencies that's lower than normal." The petitioner said he told trial counsel that he "could hear them sublimining" in the court room and that he assumed it was his Uncle Alton, who was "a real good friend of the guy that got murdered." He said he did not tell his evaluators about the subliminal messaging because he was afraid they would diagnose him as "a paranoid schizophrenic."

Trial counsel said that he was initially appointed in February 1995 by the general sessions court to represent the petitioner. Trial counsel stated that the petitioner's

theory of defense was that the victim had committed suicide. Trial counsel explained, "When I first met him and told him that [the victim] had been shot and strangled and beaten and wrapped in plastic and dumped in a landfill in Sequatchie County, he said that [the victim] committed suicide." He said that the petitioner "indicated later that maybe somebody had killed [the victim] because he was a homosexual." The petitioner did not, however, claim to have an alibi. Trial counsel said that the petitioner's defense was that he "[d]idn't have any knowledge of it, didn't do it" and that the petitioner even denied having any involvement with the Regulators. Trial counsel stated that, contrary to his assertion, the petitioner did testify at trial and that he "was on the stand for a goodly period of time." He said that the petitioner "was a pretty good witness."

Trial counsel testified that although he met with Ms. Lamb on at least eight occasions and although she brought certain potential witnesses for him to talk to, she never mentioned the petitioner's having been at her house at the time of the victim's murder.

Trial counsel stated that after the petitioner claimed to be hearing subliminal messages in the jail, counsel moved the court for a mental evaluation. The evaluation team opined that the petitioner was competent to stand trial.

During cross-examination, trial counsel acknowledged that he did not object when Mr. Beard testified that the petitioner was a drug dealer, explaining, "Sometimes something is so insignificant at the time when you're talking about the murder and numerous thefts that it may not have been an issue."

At the conclusion of the hearing, the post-conviction court took the petition under advisement. In its later-issued findings of fact and conclusions of law, the post-conviction court denied relief, finding that the petitioner had not been deprived of the effective assistance of counsel. Specifically, the court accredited trial counsel's testimony that neither the petitioner nor Ms. Lamb ever mentioned the petitioner's having an alibi and concluded that trial counsel did not perform deficiently by failing to present an alibi defense. The court also concluded that "[t]he overwhelming evidence of the petitioner's guilt" overrode any potential prejudice created by trial counsel's handling of any of the evidentiary issues. Finally, the court concluded that the petitioner's remaining claims were waived, previously determined, or not cognizable in a post-conviction proceeding.

In this appeal, the petitioner contends that he was denied the effective assistance of counsel at trial because his trial counsel failed to offer alibi witnesses at trial, failed to follow up on his motion for a mental evaluation, failed to object to the petitioner's being characterized as a drug dealer, and opened the door for the petitioner's prior bad acts to be admitted into evidence. The State contends that the petitioner failed to establish his

claims by clear and convincing evidence. We agree with the State.

We view each of the petitioner's claims with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State*

*v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner first contends that "it is difficult to fathom how failing to present numerous available alibi witnesses at trial could not be deemed ineffective." Initially, although the petitioner asserts that as many as 50 or 60 people could have corroborated the petitioner's alleged alibi that he was at a family celebration at the time of the victim's murder, only four witnesses, including the petitioner himself, provided testimony at the evidentiary hearing. The possible testimony of any other witnesses would be speculation and could not form the basis for post-conviction relief. "When a [post-conviction] petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). If he fails to do so, he generally fails to establish ineffective assistance of counsel. *Id.* The post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Id.*; *see also Wade v. State*, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).

With regard to the witnesses who actually testified at the evidentiary hearing, Ms. Lamb and Ms. Nelson testified that the family celebration took place on November 12, 1995, and Ms. Moss could not recall the specific date of the celebration. According to the evidence presented at trial, the victim was murdered on November 12, 1994, one year before the alleged celebration. Moreover, none of the witnesses, including the petitioner himself, testified that they told trial counsel about the petitioner's alleged alibi. Trial counsel's assistance cannot be deemed deficient for his failing to present evidence he did not know existed.

The petitioner also contends that trial counsel's failure to object to Mr. Beard's characterizing the petitioner as a drug dealer prejudiced him. Trial counsel testified, and the post-conviction court concluded, that the testimony was "insignificant" in light of the overwhelming proof of the petitioner's guilt. We agree. Although Mr. Beard's testimony was arguably objectionable, we cannot reasonably say that trial counsel's failure to lodge an objection affected the outcome of the trial because, as this court noted on direct appeal, the evidence of the petitioner's guilt was overwhelming.

The petitioner also claims that trial counsel performed deficiently by engaging in cross-examination that "open[ed] the door to the beating episode of Robert Newman." Trial counsel questioned Mr. Beard regarding his knowledge of the petitioner's physical limitations in an attempt to show that the petitioner was incapable of inflicting the victim's injuries, and the trial court concluded that this line of questioning opened the door for the State to question Mr. Beard about the petitioner's administering a beating to Robert Newman

-6-

as punishment for a violation of gang rules. We fail to see that trial counsel's questioning qualifies as deficient performance, let alone how it can be characterized, as the petitioner does, as a "flagrant mistake." Counsel's line of questioning was relevant. Moreover, the overwhelming proof of the petitioner's guilt would, again, militate against a finding of prejudice.

Finally, the petitioner claims that trial counsel performed deficiently by failing to have the petitioner evaluated to determine his sanity at the time of the offense. The record establishes that trial counsel requested a mental evaluation after the petitioner reported that he had begun to hear voices while incarcerated pending trial. The petitioner was, in fact, evaluated and deemed competent to stand trial. Although the petitioner contends that the petitioner's testimony about hearing voices suggests that the petitioner "was suffering from some sort of mental disease or defect at the time of the acts," the evidence adduced at the evidentiary hearing does not support this claim. Indeed, nothing in the record suggests that the petitioner was suffering from a mental disease or defect at the time of the offenses. The petitioner himself testified that he did not begin to hear voices until he had been incarcerated for some time. Moreover, the petitioner failed to present any testimony, expert or otherwise, to establish that an insanity defense could have been supported. As such, he is not entitled to relief.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-7-